```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA      )
                              )
        vs.                   )   Criminal No. 03-CR-10377-WGY
                              )
                              )
ERIC LINO,                    )
                              )
    Defendant                 )
```

**NOTICE OF GOVERNMENT'S INTENT TO INTRODUCE EVIDENCE**

The United States of America, by its attorneys, Michael J. Sullivan, United States Attorney for the District of Massachusetts, and David G. Tobin and William D. Weinreb, Assistant United States Attorneys, hereby notifies defendant, Eric Lino, and the Court of its intention to offer the following evidence at Lino's trial.

A.   Background

Eric Lino is charged in a two-count Superseding Indictment with conspiracy to distribute cocaine from at least June 2001 to at least June 2003 (Count One) and distribution of cocaine on June 18, 2003 (Count Two).  The Superseding Indictment alleges that the conspiracy involved five kilograms or more of cocaine, meaning that 21 U.S.C. § 841(b)(1)(A) applies, and that Lino is personally responsible for five to fifteen kilograms of cocaine, meaning that USSG §2D1.1(c)(4) applies.

The government's evidence will show that Lino sold 12.4 grams of cocaine to a DEA confidential source on February 10, 2004, and sold 55.2 grams of cocaine to a DEA undercover agent on

June 18, 2004. In addition, witnesses who assisted Lino in his drug business will testify from personal knowledge that Lino sold cocaine on a near-daily basis during the two-year period covered by the conspiracy. Those additional cocaine sales total over five kilograms.

Based on conversations with Lino's attorney, the government believes that the chief disputed issue at trial will be whether Lino was in fact a full-time (or nearly full-time) drug trafficker who in fact sold five kilograms or more of cocaine during the period covered by the conspiracy.

### A. Testimony concerning Lino's ownership of a gun

The government anticipates that one or more witnesses will testify from personal knowledge that Lino owned and sometimes carried a handgun. The government views this as intrinsic evidence that is relevant to the issue of whether Lino was indeed a professional drug trafficker. It is common knowledge that guns and drugs go together and that drug dealers often carry guns for their protection.

### B. Gun-related evidence seized from Lino's bedroom

After the defendant was taken into custody on July 30, 2003, a search of his bedroom turned up various items, including: ammunition, a gun cleaning kit, and a semiautomatic weapon magazine. The government intends to offer these items as proof that Lino in fact owned a gun. (The government also intends to

offer other items recovered from Lino's bedroom, including a bottle of Inositol powder and miscellaneous documents.)

    C.    <u>112 grams of cocaine hidden by Lino's girlfriend</u>

On July 31, 2004 (i.e. the day after Lino was taken into custody), law enforcement officers went to the home of Lino's girlfriend, Nicole Rodrigues, and asked for her consent to search it. The officers believed that Lino kept drugs at Rodrigues's house because Lino had made a brief stop inside the house immediately before selling a DEA undercover agent cocaine on June 18, 2003. Rodrigues refused to consent to a search of her house. Approximately 30 minutes later, witnesses saw Rodrigues walk from a wooded area that separates the back of her house from a nearby industrial area, crouch down behind a dumpster, and walk directly back towards her home. One of the witnesses went over to the dumpster and found hidden below it a plastic bag containing 112 grams of cocaine and a digital scale. The witness immediately reported these events to the police. A short time later, when the witness saw Rodrigues back at the dumpster, he told her that the police were on their way; Rodrigues immediately got into her car and drove off. (A Massachusetts grand jury has indicted Rodrigues for cocaine trafficking based on these events.)

On July 31, 2003, Lino called Rodrigues from the Barnstable County House of Correction, where he was detained. (A transcript of the call is attached.) The two discussed the fact that

Rodrigues had gotten rid of the cocaine and that she had found it inside the pocket of a pair of Lino's pants that were on the floor.  Specifically, Rodrigues said to Lino, **"Well, like, some of that, is gone, 'cause, like, I messed up, but it's OK."**  Lino asked Rodrigues if she meant **"that water."**  Rodrigues said, **"No, it's not water, no, it was, like, worse than that, but I think it's gonna be OK.  It was like, I left, and I ran, like, somewhere, and go make a stop, and, like, put my stuff away, and somebody saw me, and they went to see what it was, and then I went back, and they were, like, I see that, I'm doin' this, I'm doin' that . . . ."**  Lino asked Rodrigues if she was referring to his **"letters."**  Rodrigues said, **"No, no, no, no, no.  The other thing."**  Lino then asked, **"What, that was in my pocket on the floor?"**  Rodrigues responded, **"Yeah.  That was, like, the first thing I did, and I left, and went somewhere-- . . . [unintelligible] my house, and the people that work there saw me and went and did a little investigating on their own, so now it's gone, and hopefully it's just gonna stay with whoever found it, and they're not gonna bring it where they said they're gonna bring it.  And they saw my car. . . ."**

   On or about August 17, 2003, Lino, who was still detained, called Randy Rose, his mother's boyfriend, and discussed the 112 grams of cocaine with him.  (A transcript of the call is

4

attached.)  Specifically, in the course of discussing Nicole Rodrigues, Rose said to Lino, **"[T]here's something else, nigger, that, I, see, can't talk on the phone about it, you know, how can I say this to you so you'll get it . . . ."** Lino said something unintelligible, and Rose continued, **"No, the shit that was there. . . . OK, that shit should have been gone the day they found it."** Lino asked Rose what he meant.  Rose replied, **"[R]emember what I just said to you.  When I see you on Tuesday, I'm going to say something different to you.  I'm going to say, 'one twelve.'"** Rose responded, **"Yeah, I understand, I understand exactly what you're talking about. . . .  I know, right, when she, when she found, you know--"** Rose said, **"Bye. . . .  It shoulda been, 'Bye.'"** Lino said, **"I know.  She, she panicked and didn't know what the fuck to do. . . .  I know, I know, I know for a fact, you know what I'm saying, she's not gonna hurt me in no way, she can't, there's no possible way. . . ."** Rose then said, **"All right, drop this conversation, let's not talk about this anymore."**

   The government intends to offer into evidence the 112 grams of cocaine and digital scale that were found under the dumpster; the testimony of the witnesses who saw Nicole Rodrigues put those objects there; and the two phone calls between Lino and Rodrigues

5

and Lino and Rose, respectively, in which Lino discusses the 112 grams of cocaine.  The government contends that the cocaine was Lino's and that it is evidence both of his participation in the charged conspiracy and of his responsibility for the quantity of drugs charged in the Superseding Indictment.

    D.    <u>Evidence that Lino owned luxury vehicles and paid cash for them</u>

The government intends to offer testimony and documentary evidence that Lino owned and paid cash for several luxury vehicles, including a Cadillac Escalade with $12,000 rims and other extras, and a pair of Jet Skis.  The government contends that Lino's ownership of these items, and his paying cash for them, is evidence that he was in the drug business.

    E.    <u>False checks presented by Lino to his probation officer as evidence of his employment</u>

The government intends to offer testimonial and documentary evidence that Lino presented a dozen false paychecks to his Massachusetts probation officer for the purpose of deceiving the probation officer into believing that Lino was legitimately employed.

On October 26, 2001, Lino was convicted in Falmouth District Court of possession with intent to distribute cocaine.  He was sentenced to 2-1/2 years, six months' committed, the balance suspended until October 24, 2003.  While serving the probationary

portion of his sentence, Lino presented to his probation officer a dozen checks over time that were drawn on the account of Baptiste Masonry Company. Each check bore a memo such as "40 hours" or "35 hours," and Lino falsely told his probation officer that he had received the checks for working the corresponding number of hours during the preceding week at Baptiste Masonry.

In addition to offering the checks themselves, the government will offer testimony that Lino did not work the hours indicated on the checks, was not paid the amounts indicated on the checks, and never cashed any of the checks. This evidence is relevant to show that Lino had no legitimate source of income during the period covered by charged conspiracy (a period when Lino was nonetheless purchasing high-priced luxury vehicles, as discussed above).

F. <u>Evidence of Lino's 2001 conviction</u>.

Pursuant to Federal Rule of Evidence 609(a), if Lino chooses to testify, the government will seek to impeach him with his 2001 Falmouth District Court conviction for possession with intent to distribute cocaine.

Pursuant to Federal Rule of Evidence 404(b), the government will seek to offer Lino's 2001 conviction possession with intent to distribute cocaine as proof of motive, intent, knowledge, and/or absence of mistake or accident if Lino's defense raises a

genuine issue as to motive, intent, knowledge and/or absence of mistake or accident.

                                  Respectfully submitted,

                                  MICHAEL J. SULLIVAN
                                United States Attorney

By:  /s/ William D. Weinreb
     WILLIAM D. WEINREB
     DAVID TOBIN
     Assistant U.S. Attorneys
     U. S. Attorney's Office
     United States Courthouse
     1 Courthouse Way, Suite 9200
     Boston, MA  02210
     617-748-3222